SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
PETER H. KLEE, Cal. Bar No. 111707
MADALYN A. MACARR, Cal. Bar No. 301539
501 West Broadway, 19th Floor
San Diego, California 92101-3598
Telephone:  619.338.6500
Facsimile:   619.234.3815
E mail        pklee@sheppardmullin.com
              mmacarr@sheppardmullin.com

Attorneys for Defendants, Allstate
Insurance Company and Allstate Fire &
Casualty Insurance Company

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| JACLYN A. KERRIGAN,<br><br>              Plaintiff,<br><br>       v.<br><br>ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, and DOES 1-50, Inclusive,<br><br>              Defendants. | Case No. 2:20-cv-05969 JFW<br><br>*[The Hon. Judge John F. Walter]*<br>*[Magistrate Judge Maria A. Audero]*<br><br>**DEFENDANTS ALLSTATE INSURANCE COMPANY AND ALLSTATE FIRE & CASUALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>*[Notice of Motion and Motion, Declarations of Madalyn Macarr, Cory Isaac, Lynn Williamson, and Jay McClaugherty, Separate Statement, and Compendium of Evidence filed concurrently herewith; [Proposed] Judgment lodged concurrently herewith*<br><br>Date:     May 10, 2021<br>Time:     1:30 p.m<br>Crtrm:   7A<br><br>Pre-Trial Conference:  June 25, 2021<br><br>Trial Date:   July 13, 2021 |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................... 1

II.  SUMMARY OF FACTS ........................................................................... 3

    A.   Plaintiff's Allstate Automobile Policy ......................................... 3

    B.   Plaintiff's Accident and Resulting UIM Claim ........................... 3

    C.   Allstate Attempts to Investigate Plaintiff's Claim, But Plaintiff Does Not Cooperate With Allstate's Requests for Information ........... 5

    D.   Plaintiff Sends "Some" Documents to Allstate to Support Her Policy Limit UIM Demand .......................................................... 6

    E.   Plaintiff Demands Arbitration ...................................................... 8

    F.   Allstate Informs Plaintiff She Can Increase Her Demand By $15,000 .......................................................................................... 9

    G.   The Parties Attempt to Decide on an Arbitrator, To No Avail ............... 9

    H.   Allstate Continues Investigating the Claim .............................. 10

    I.   Plaintiff Was Unable To Answer Questions About Her Loss of Income At Her Deposition ......................................................... 11

    J.   Allstate Nevertheless Resolves the Claim In Plaintiff's Favor and Pays Plaintiff the Policy Limit ................................................. 12

III. PLAINTIFF'S BAD FAITH CLAIM HAS NO MERIT ............................... 13

    A.   The Standards for Evaluating a Bad Faith Claim ..................... 13

    B.   It Is Not Unreasonable to Withhold Payment Where There is a "Genuine Dispute" About the Value of the Claim .................... 14

    C.   A Genuine Dispute Existed As to the Value of Plaintiff's Claim, Precluding Bad Faith Liability ................................................... 15

    D.   Allstate Did Not Unreasonably Delay the Claim ..................... 17

    E.   Plaintiff's Failure to Return Requested Wage Authorization Forms Precludes Any Recovery ................................................. 19

    F.   Allstate Did Not Engage In Bad Faith Conduct By Asking Plaintiff For A Release ............................................................... 19

    G.   The Parties' Inability to Agree Upon an Arbitrator Does Not Constitute Bad Faith ................................................................... 20

IV.    THE CLAIM AGAINST ALLSTATE INSURANCE COMPANY FAILS.................................................................................21

V.    THE PUNITIVE DAMAGES CLAIM FAILS AS A MATTER OF LAW .............................................................................22

VI.    CONCLUSION ...........................................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. Liberty Lobby Inc.*
411 U.S. 242 (1986) ...................................................................................... 23

*In re Angelia P.*
28 Cal. 3d 908 (1981)...................................................................................... 23

*Avidity Partners, LLC v. State of Cal.*
221 Cal. App. 4th 1180 (2013) ...................................................................... 21

*Beagle v. Vasold*
65 Cal. 2d 166 (1966)...................................................................................... 16

*Beck v. State Farm*
54 Cal. App. 3d 347 (1976)............................................................................ 23

*Blake v. Aetna Life Ins. Co.*
99 Cal. App. 3d 901 (1979)............................................................................ 17

*Board of Trustees of Univ. of Illinois v. Insurance Corp. of Ireland*
969 F. 2d 329 (7th Cir. 1992)......................................................................... 23

*Capelouto v. Kaiser Found. Hosp.*
7 Cal. 3d 889 (1972)........................................................................................ 16

*Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*
90 Cal. App. 4th 335 (2001) ........................................................... 13, 14, 15

*Collins v. Allstate Indem. Co.*
2010 U.S. Dist. LEXIS 2144 (N.D. Cal. Jan. 12, 2010) ........................... 20

*Congleton v. Nat'l Union Fire Ins. Co.*
Cal. App. 3d 51, 59 (1987).............................................................................. 14

*Cruz v. HomeBase*
83 Cal. App. 4th 160 (2000) .......................................................................... 24

*Everett v. State Farm Gen. Ins. Co.*
162 Cal.App.4th 649 (2008) .......................................................................... 21

*Fraley v. Allstate Ins. Co.*
81 Cal. App. 4th 1282 (2000) ........................................................................ 14

-iii-

*Gellis v. Allstate Ins. Co.*
1999 U.S. Dist. LEXIS 15596 (C.D. Cal. Sept. 27, 1999)............................................ 20

*Globe Indemnity Co. v. Superior Court*
6 Cal. App. 4th 725 (1992) ...................................... 17

*Greater Westchester Homeowners Assn. v. County of Los Angeles*
26 Cal. 3d 86 (1979)........................................ 16

*Guebara v. Allstate Insurance Co.*
237 F. 3d 987 (2001)...................................... 14

*Gunderson v. Fire Ins. Exch.*
37 Cal.App.4th 1106 (1995) ...................................... 22

*Ives v. Allstate Ins. Co.*
2021 U.S. Dist. LEXIS 52421, ___ F.Supp.3d ___ (C.D. Cal. 2021) ...................... 15

*Love v. Fire Ins. Exch.*
221 Cal. App. 3d 1136 (1990)........................................ 19, 21

*Mallard v. Progressive Choice Ins. Co.*
188 Cal. App. 4th 531 (2010) ...................................... 21

*Maynard v. State Farm Mut. Auto Ins. Co.*
499 F. Supp. 2d 1154 (C.D. Cal. 2007) ........................... 13, 14, 17

*Myers v. Allstate Indem. Co.*
109 F. Supp. 3d 1331 (C.D. Cal. June 16, 2015) .................... 15, 19

*O'Hara v. Western Seven*
75 Cal. App. 3d 798 (1977)........................................ 23

*Rappaport-Scott v. Interinsurance Exch. of the Auto Club*
146 Cal. App. 4th 831 (2007) ...................................... 13, 14

*Seffert v. Los Angeles Transit Lines*
56 Cal. 2d 498 (1961)........................................ 16

*Sekera v. Allstate Ins. Co.*
2017 U.S. Dist. LEXIS 153601 (C.D. Cal. Sept. 19, 2017)........................... 15

*Shade Foods, Inc. v. Innovative Prods. Sales & Mktg.*
78 Cal. App. 4th 847 (2000) ...................................... 23

*Stewart v. Truck Ins. Exch*
17 Cal. App. 4th 468 (1993) ...................................... 22, 23

*Tomaselli v. Transamerica Ins. Co.*
25 Cal. App. 4th 1269 (1994) ................................................................ 24

*Waller v. Truck Ins. Exch.*
11 Cal. 4th 1 (1995) ............................................................................. 21

*White v. Ultramar, Inc.*
21 Cal. 4th 563 (1999) .......................................................................... 24

Statutes

Cal. Civ. Code § 3294................................................................................ 22

Cal. Code Reg. § 2695.4(e)(1)................................................................... 20

Cal. Ins. Code § 11580.2(o)...................................................................... 19

## I.    INTRODUCTION

This is an insurance bad faith case arising out of Plaintiff Jaclyn Kerrigan's underinsured motorist ("UIM") claim.  It is undisputed that, after completing its investigation, Allstate Fire & Casualty Insurance Company paid Plaintiff's claim in full.  Her sole complaint is that Allstate should have paid her claim without question, rather than investigating it.  But just because an insurance company initially questions or even disagrees with a policyholder over what a claim is worth does not mean that it acts in bad faith.  To the contrary, where a legitimate disagreement – in legal parlance, a "genuine dispute" – exists about the value of an insurance claim, an insurer cannot be liable for bad faith simply because it doesn't pay what the insured demands as soon as the insured demands it.  This case illustrates the rule.

Plaintiff was involved in an October 2016 automobile accident in Las Vegas, Nevada and allegedly sustained injuries as a result of the accident.  Plaintiff's Allstate Policy included a $25,000 per person UIM coverage limit.  14 months later, after recovering the $15,000 policy limit from the at-fault driver's insurer, Plaintiff demanded that Allstate tender $2,000 in medical payment benefits and $10,000 in UIM coverage – the amount her counsel mistakenly believed was Plaintiff's policy limit after reducing the coverage limit by the amount recovered from the at-fault driver.  However, in investigating Plaintiff's claim, Allstate learned that under the terms of Plaintiff's policy, she could actually recover the full $25,000 from Allstate, assuming she could show at least $40,000 in total damages (the recovery from the other driver still serves as a *damages* offset under Plaintiff's policy).  ***It was Allstate that alerted Plaintiff to the fact that she could seek the full $25,000 policy limit***, so that she could increase her demand by $15,000.  In other words, had Allstate *not* investigated the claim – and instead simply paid Plaintiff's $10,000 demand at any point prior to Plaintiff's arbitration demand –  Plaintiff would have recovered $15,000 *less*.  This is illustrative of Allstate's good faith – not bad faith – in

connection with Plaintiff's claim.

Allstate needed to investigate the claim because Plaintiff initially claimed, with virtually no support, that she had $18,500 in lost earnings as a result of the accident. She then changed that figure, again without support, to $28,500. Given that she had only $11,634 in claimed medical bills (of which she had already recovered $2,000 from Allstate in medical payment benefits) and had recovered $15,000 from the other driver's insurer, Plaintiff's claim was not worth the $25,000 policy limit without her lost earnings (if they could be substantiated). Because there was a question regarding Plaintiff's unsubstantiated loss of earnings claim, Allstate was compelled to investigate further before it could reasonably evaluate that key aspect of her claim. Those investigation efforts, however, were thwarted by Plaintiff's refusal to provide a signed wage authorization form or employer information form. Despite the fact that the lost earnings claim remained questionable, in a further act of good faith, Allstate ultimately resolved the dispute in her favor and paid her the $25,000 policy limit.

Nevertheless, proving the adage that "no good deed goes unpunished," Plaintiff responded to the policy limit payment by filing this lawsuit asserting a single cause of action for insurance bad faith. The crux of Plaintiff's complaint is that Allstate didn't pay her the $25,000 as quickly as she wanted it to be paid. This "delay" claim fails as a matter of law because it is well-established that an insurer cannot be liable for withholding or delaying payment if there is a "genuine dispute" about the value of an insured's claim. Here, there was a genuine dispute regarding the most significant component of Plaintiff's claim – her lost earnings. Those claimed damages remained largely unsubstantiated even until the time Allstate ultimately paid her claim. Without her (claimed but unsubstantiated) lost earnings, Plaintiff's claim was not worth the $25,000 policy limit Allstate ultimately paid her.

Separately, as a matter of law, Allstate cannot be liable for bad faith while it was duly investigating Plaintiff's claim.

Finally, Plaintiff's failure to return Allstate's requested wage authorization form means that Plaintiff never became entitled to any policy benefits, which independently precludes a finding of bad faith.

Regardless of how the Court rules on Plaintiff's bad faith claim, it should grant partial summary judgment on her punitive damages claim. There is no evidence – let alone clear and convincing evidence – of malice, oppression, or fraud by Allstate, or ratification by a managing agent.

## II. <u>SUMMARY OF FACTS</u>

### A. Plaintiff's Allstate Automobile Policy

Allstate Fire & Casualty Company issued a Nevada auto policy to Plaintiff that included $25,000 in UIM coverage per person and $50,000 per accident.[1] (Undisputed Fact ("UF") Nos. 1, 2). Plaintiff's Policy provided that Allstate is entitled to a damages offset against UIM coverage equal to the amount paid by the at-fault driver's insurer. (UF No. 3). The Policy obligated Plaintiff to cooperate and provide information requested by Allstate, "including all details reasonably required by [Allstate] to determine the amounts payable." (UF No. 4). The Policy specifically obligated Plaintiff to authorize Allstate to obtain her medical and other records and to submit to questioning under oath. (UF Nos. 5, 6). Failure to comply with all policy terms bars bringing a suit against Allstate on the policy. (UF. No. 7).

### B. Plaintiff's Accident and Resulting UIM Claim

At the time of the accident, Plaintiff worked as a baker and magician's assistant in Las Vegas, Nevada.[2] (UF No. 8). On October 9, 2016, Plaintiff's then-boyfriend was driving Plaintiff's vehicle and Plaintiff was riding as a passenger.

---

[1] For reasons that are unclear, Plaintiff has also improperly named Allstate Insurance Company, an entity that did not issue the insurance contract and so has no obligation to Plaintiff thereunder, as a defendant to this action. (*See* UF No. 133).

[2] As of the time Plaintiff filed her Complaint, as alleged, "Plaintiff is an individual, residing in Los Angeles County, California." (ECF No. 1-1, Complaint, at ¶ 1).

1    (UF No. 9).  They were rear-ended while waiting at a red light at an intersection in

2    Las Vegas.  (UF No. 10).  The accident was not major: the airbags in Plaintiff's

3    vehicle did not deploy (UF No. 12); no ambulance was called to the scene (UF No.

4    13); the parties did not obtain a police report (UF No. 14); and Plaintiff and the at-

5    fault driver were both able to drive their respective vehicles away from the scene

6    (UF Nos. 15, 16).  Even Plaintiff has admitted that, at the time of the accident, the

7    "actual impact…didn't feel extreme."  (UF No. 17).  Indeed, Plaintiff waited 37

8    days before first receiving any medical treatment for injuries she allegedly sustained

9    in the accident.  (UF No. 18).

10          Plaintiff was not eligible for UIM coverage until she exhausted the other

11   driver's insurance coverage.  Over a year after the accident, Plaintiff eventually

12   recovered the other driver's $15,000 policy limits for her injuries on December 18,

13   2017.  (UF No. 32).  Plaintiff did not think it was unreasonable for the other driver's

14   insurer to take over a year to provide its $15,000 policy limit.  (UF No. 33).

15          On December 6, 2017, Plaintiff demanded that Allstate tender $2,000 in

16   medical payment benefits and "$10,000 policy limits" under the Policy's UIM

17   coverage.  (UF No. 34).  The letter did not indicate what Plaintiff's injuries were,

18   how much she had incurred in medical expenses, or whether she was claiming any

19   wage loss.  Instead, Plaintiff's counsel merely expressed that he "believe[d] Ms.

20   Kerrigan's 'claim' has a value in excess of $10,000" based on his non-descript

21   "view of the significance of my client's injuries and their permanent nature."  (*Id*.)

22   The letter did not include any documents suggesting Plaintiff's injuries were

23   permanent.  (*See id*.)  Plaintiff's initial demand letter also did not contain *any*

24   supporting documentation (*e.g*., medical records, bills, or wage loss documentation)

25   to support her claim.  (UF No. 37).  At the time she submitted her December 6,

26   2017 demand for $10,000 in UIM "policy limits," Plaintiff was unaware that her

27   policy did not require a UIM coverage limit reduction for the amount recovered

28   from the at-fault driver.  (UF Nos. 35, 36).

Allstate promptly acknowledged receipt of Plaintiff's initial demand letter and noted that Allstate "only received your demand letter and the release from the liability carrier.  We require medical records and itemized (and properly coded) bills…Until we receive these items our adjuster will not be able to complete the evaluation."  (UF No. 38).

### C.   Allstate Attempts to Investigate Plaintiff's Claim, But Plaintiff Does Not Cooperate With Allstate's Requests for Information

Immediately after it first received notice of the loss shortly after the accident, Allstate began investigating Plaintiff's claim, including by requesting information to support any lost wages claim.  On December 20, 2016 and August 30, 2017, Allstate sent Plaintiff a claim form to complete, sign and return.  (UF Nos.  19, 27).  Among other things, the claim form sought basic information about Plaintiff's medical providers, occupation, and wages.  (*See id.*)  Plaintiff never returned the form.  (UF No. 28).

On each of December 20, 2016, December 21, 2016, and August 30, 2017, Allstate also sent Plaintiff medical and wage authorization forms as well as forms requiring Plaintiff to identify her medical provider(s) and employer(s).  (UF Nos. 20, 21, 29).  Plaintiff finally returned the medical authorization form on February 22, 2018 (UF No. 61) and provided an incomplete list consisting of only two medical providers on March 14, 2018 (UF Nos. 71, 72, 100), but never returned the wage authorization form (UF No. 31) and never returned the employer identification form.  (UF No. 67).

On March 2, 2017, May 9, 2017, and July 14, 2017, Allstate repeatedly wrote to Plaintiff asking for information to support her "wage loss" claim, specifically including "the most current information you have" regarding her "employer, duration, salary."  (UF Nos. 22-24).  Plaintiff never provided the requested information.  (UF No. 25).

SMRH:4817-0860-5146.2

**D.** **Plaintiff Sends "Some" Documents to Allstate to Support Her Policy Limit UIM Demand**

On December 11, 2017, in connection with Plaintiff's claim for $2,000 in maximum medical payment benefits under the Policy, Plaintiff's counsel sent a letter attaching medical bills totaling $11,634 and records indicating Plaintiff had suffered minor soft tissue injuries as a result of the accident.  (UF Nos. 39, 40).  "Allstate promptly paid the $2,000 in med-pay benefits" (Complaint, ¶ 15), exhausting the available coverage limit by December 29, 2018.  (UF Nos. 41, 42).

On January 23, 2018, Plaintiff's counsel emailed Allstate additional medical bills and records and claimed that Plaintiff's expenses were ongoing.  (UF No. 44).  Plaintiff's counsel claimed – without support, further elaboration or any documentation – that Plaintiff's "bakery job is also suffering losses due to her not being able to perform as fast and efficient as she could before."  (UF Nos. 45, 46).

On January 29, 2018, Allstate sent a letter noting that certain medical records were missing and that until Allstate received the missing items, it would be "unable to fairly evaluate this demand."  (UF No. 47).  Plaintiff admits Allstate's request for these missing records, as of January 29, 2018, was reasonable.  (UF Nos. 48, 49).  On February 9, 2018, Plaintiff's counsel provided Allstate, for the first time, with copies of "some of Ms. Kerrigan's documents that support her loss [sic] wages claim."  (UF No. 52).  Included was an unsworn statement (an email) from a magician (dated August 27, 2017) in which the magician identified 15 contortionist and magician's assistant engagements that Plaintiff purportedly lost after the accident due to her injuries.  (UF No. 53).  He estimated, without any further breakdown, that this amounted to a total loss of income of $18,500.  (UF No. 54).  Plaintiff also included with her February 9, 2018 letter an unverified list of payments totaling $2,452.98 which Plaintiff claimed she had to pay someone she hired to help her with her bakery business.  (UF No. 55).  Finally, Plaintiff included evidence of a $225 refund she purportedly returned to a bakery client because she

was "unable to complete the job due to her injuries." (UF No. 56). This is the only "evidence" Plaintiff submitted to Allstate – at any point during her claim – to corroborate her lost earnings claim. (UF Nos. 76, 112, 126). Plaintiff did not provide any personal or business tax returns, or personal or business bank account statements, or any other records verifying her historical income, to Allstate at any point during her UIM claim. (UF Nos. 122-125).

Not surprisingly, Allstate concluded that this unverified and incomplete information was insufficient to reasonably evaluate Plaintiff's actual wage loss. Therefore, on February 12, 2018, Allstate e-mailed Plaintiff's counsel explaining that it needed more information to substantiate Plaintiff's lost earnings claim. (UF No. 57). For example, the email from the magician prompted the question of how much Plaintiff made per performance as a magician's assistant, her employment history with that magician, and what guarantee there was that Plaintiff would have been hired for all of the magician's assistant engagements. (*See id.*) Allstate also asked for Plaintiff's pre-accident medical records so that it could evaluate whether her claimed injuries were in fact caused by the accident. (UF No. 58). Allstate explained that it was "unable to complete the UIM evaluation pending receipt of the requested information." (UF No. 59). Plaintiff did not think it was unreasonable for Allstate to be requesting this information as of February 12, 2018. (UF No. 60).

Plaintiff's counsel responded 10 days later, on February 22, 2018, finally returning Plaintiff's medical authorization form that Allstate had first asked for 15 months earlier, in December 2016. (UF Nos. 20, 61). Plaintiff did not provide any additional documentation reflecting her lost earnings and only referenced the $18,500 allegedly lost from the magician's assistant jobs identified in the email from the magician. (UF No. 62). Instead, her counsel provided his personal estimate (again unverified) that the "block of approximately 30 performances… averages about $600 per performance." (*See id.*). Counsel's personal estimate was not helpful. (UF No. 64). What Allstate needed, but what Plaintiff's counsel did

1  *not* provide, was a list of employers or the wage authorization form that Allstate had

2  repeatedly requested, which would have enabled Allstate to contact and obtain wage

3  information from Plaintiff's employer(s).  (UF No. 65).  Indeed, neither Plaintiff nor

4  her counsel *ever* cooperated with those requests, despite the fact that the insurance

5  policy required that Plaintiff provide "all details reasonably required by [Allstate] to

6  determine the amounts payable."  (UF Nos. 4, 66, 67).

7       The very next day, on February 23, 2018, Allstate advised Plaintiff's counsel

8  that it "require[d] a list of providers that [Plaintiff] treated at for the last 5 years."

9  (UF No. 69).  Plaintiff admits this request was reasonable.  (UF No. 70).  Nearly

10  three weeks later, on March 14, 2018, Plaintiff's counsel finally returned Plaintiff's

11  Medical Provider Information form.[3]  (UF No. 71).  The form identified only two

12  providers, West Oaks Urgent Care and Planned Parenthood, neither of which

13  Plaintiff had actually seen for any injuries relating to her car accident.  (UF Nos. 72,

14  73).  On March 22, 2018, Allstate reached out directly to West Oaks Urgent and

15  Planned Parenthood for records.  (UF No. 77).

16       **E.    Plaintiff Demands Arbitration**

17       On April 4, 2018, Allstate sent Plaintiff's counsel a letter reiterating that it

18  was still waiting on paperwork from Plaintiff.  (UF No. 78).  Plaintiff's counsel

19  responded on April 13, 2018 by referencing his initial demand for the UIM limit

---

25  [3] Plaintiff's counsel also included receipts for new clothing, including 30 new
dresses, for "the new wardrobe our client needed to purchase to continue her
26  magician assistant jobs."  (UF No. 74).  He also attached an update to the list of
27  payments Plaintiff paid someone to help her with her bakery business adding
$764.00 to her previous list for a total of $3,216.98 in payments from December 11,
28  2016 through February 17, 2018.  (UF No. 75).

($10,000) made on December 6, 2017 and making a formal demand for arbitration.[4] (UF No. 79).

### F.      Allstate Informs Plaintiff She Can Increase Her Demand By $15,000

During the course of its investigation, Allstate learned that, under Plaintiff's Nevada policy, Plaintiff's $25,000 UIM policy limit was not reduced by the $15,000 she had received from the other driver.  Therefore, on April 18, 2018, Allstate advised Plaintiff's counsel about this discrepancy and that "[t]he $25k UIM limits are available on top of the tort limit."  (UF No. 81).  In other words, Allstate advised Plaintiff's counsel that Plaintiff could claim $15,000 more in policy benefits than she originally demanded, and Plaintiff changed her demand to $25,000 based on the information Allstate provided.  (UF No. 82).

### G.      The Parties Attempt to Decide on an Arbitrator, To No Avail

Because Plaintiff had demanded arbitration, Allstate promptly assigned the matter to McClaugherty & Associates ("McClaugherty") to represent Allstate in the UIM arbitration proceedings.  (UF No.  83).  Plaintiff's counsel and McClaugherty exchanged a series of letters over the ensuing six (6) months regarding proposed arbitrators.  (UF Nos. 84-87, 90).  Among the arbitrators McClaugherty proposed was Robert Tessier.  (UF No. 88).  Plaintiff's counsel, however, rejected all of McClaugherty's proposed arbitrators.  (UF No. 89).  On January 21, 2019, Plaintiff filed a petition to compel arbitration in the Los Angeles Superior Court.  (UF No. 92).  Allstate did not oppose Plaintiff's petition.  (UF No. 93) (joining in the request for "the Court's assistance in the selection of a neutral arbitrator," since "both parties have had difficulty in coming to an agreement of a neutral arbitrator.")  The Court granted the petition on March 1, 2019 and appointed Robert Tessier, one of

---

[4] As of Plaintiff's demand for arbitration on April 13, 2018, Plaintiff's counsel still mistakenly believed that the recovery from the other driver's insurance provided a policy offset against Plaintiff's $25,000 UIM policy limit.   (UF 80).

1   the very arbitrators McClaugherty had proposed several months earlier.[5]  (UF Nos.

2   88, 94).

3       **H.    Allstate Continues Investigating the Claim**

4           In the meantime, the parties engaged in discovery in connection with the UIM

5   arbitration.  Each party propounded and responded to written discovery.  (UF No.

6   96).  Plaintiff requested, and Allstate granted, an extension of time for Plaintiff to

7   provide her written responses to Allstate's discovery requests.  (UF No. 97).

8   Plaintiff provided her responses to Allstate's discovery, including Allstate's form

9   interrogatories, on October 16, 2018.  (UF No. 98).  In her interrogatory responses,

10  Plaintiff identified five additional medical providers she had not previously

11  disclosed on the Medical Provider Identification form.  (UF Nos. 99, 100).  Upon

12  learning of these newly-disclosed providers, on October 19, 2018, Allstate promptly

13  issued subpoenas for their medical and billing records.[6]  (UF No. 101).

14          In her October 2018 discovery responses, Plaintiff also claimed, for the first

15  time, that she had lost over $10,000 attributable to her bakery business as a result of

16  the accident.  (UF No. 104).  But the only documentation Allstate had regarding

17  Plaintiff's claimed loss of earnings from her bakery business were an unverified list

18

19  _____

20  [5] As Allstate later learned, notwithstanding the Court's appointment of Mr. Tessier
    as the arbitrator, Mr. Tessier only performed mediations, and not arbitrations.
21  McClaugherty's office and Plaintiff's counsel were able to select an alternative
    mutually acceptable arbitrator within 24 hours after discovering this limitation on
22  Mr. Tessier's services.  (UF No. 95).
23
    [6] Among the providers identified for the first time in Plaintiff's form interrogatory
24  responses as a provider who purportedly treated her for accident-related injuries was
    her therapist, Sharon Gedan.  Allstate subpoenaed records from Ms. Gedan in
25  connection with its investigation of the underlying claim.  (UF No. 102).  In
    response, Allstate received only a single progress note indicating Plaintiff had seen
26  Ms. Gedan a total of three times, for 45 minutes each session, seeking "support and
    guidance concerning the ending of a recent relationship which she describes as the
27  most meaningful she ever had."  (UF No. 103).
28

of payments Plaintiff purportedly paid someone to help her totaling $3,216.98 and the $225 refund receipt.

On January 29, 2019, Allstate received discs from its deposition officer containing all of the subpoenaed medical and billing records.  (UF No. 105).  Shortly after receiving those records, by early February, Allstate prepared a Calendar Report[7] and Claim Detail Report, and also ran Plaintiff's medical bills through a bill review software program to verify that the charges were reasonable.  (UF No. 106).  On February 25, 2019, Allstate performed an evaluation to determine whether Plaintiff's claim would be worth the policy limit *if* the lost earnings claim could be verified at Plaintiff's upcoming deposition. [8]  (UF No. 108).  Allstate's evaluation noted the one month gap prior to Plaintiff seeking any medical treatment and gaps during her treatment (UF No. 109) and also noted that the "wage loss is soft and not well supported."  (UF No. 110).  The evaluation allocated $16,593.88 to medical expenses; $11,702.98 to lost wages; $3,500-5,000 to general damages; and $7,300-8,700 as "value drivers" based on the nature of Plaintiff's job as a contortionist and pastry chef.  This resulted in a total settlement range of **$22,068.72-24,996.86** after accounting for the $15,000 damages offset and $2,000 in medical payment benefits.  (UF No. 111).

## I.   Plaintiff Was Unable To Answer Questions About Her Loss of Income At Her Deposition

---

[7] The calendar report plotted each of Plaintiff's medical visits and reflected that Plaintiff had a 10-week gap in treatment from April to June 2017.  (UF No. 107).

[8] As of the time Allstate performed its evaluation, Plaintiff still had not provided any actual documentation to corroborate her lost earnings claim other than the single email from the magician and list of payments for the bakery assistant.  (UF No. 76, 112, 126).  So as *not* to delay its evaluation, Allstate assumed Plaintiff would be able to establish at least half of her claimed loss of earnings damages, even though they still remained unverified and were essentially based entirely on her self-reporting.  (UF No. 113).

Given that Plaintiff's wage loss claim was "not well supported," taking her deposition was critical. Allstate first noticed Plaintiff's deposition on August 27, 2018, to be taken on October 24, 2018. (UF No. 114). Two days before the deposition, on October 22, 2018, Plaintiff demanded that the deposition be rescheduled because "it is now a conflict in our calendar." (UF No. 115). Allstate obliged and re-set the deposition for November 12, 2018. (UF No. 116).

After further scheduling issues arose, Allstate eventually took Plaintiff's deposition on March 7, 2019. (UF No. 117). At her deposition, Plaintiff was not able to answer basic questions about what amount she was claiming as loss of income and insisted it was "really hard to say" how much future loss of income she expected. (UF No. 118). Plaintiff also testified that the actual impact of the accident did not feel extreme at the time. (UF No. 17). Plaintiff further admitted that no ambulance was called to the scene of the accident, and that she and her boyfriend were able to drive Plaintiff's vehicle away from the scene. (UF Nos. 13, 15). These facts, combined with the fact that Plaintiff waited 37 days before seeking medical treatment, counseled in favor of a smaller allocation for general pain and suffering damages. Plaintiff also testified, however, that she had experienced severe depression as a result of the accident. (UF No. 119). Plaintiff's testimony regarding her depression raised a new form of damages that had not been previously disclosed in her medical records.[9] (UF No. 120).

## J.   Allstate Nevertheless Resolves the Claim In Plaintiff's Favor and Pays Plaintiff the Policy Limit

Due to her inability to produce employment records or to even quantify her actual lost wages at her deposition, Plaintiff's lost wages claim remained unverified. But rather than simply rejecting the lost wages claim based on an absence of proof, Allstate instead decided to give her the benefit of the doubt and resolve the

---

[9] On the contrary, Plaintiff's medical records that Allstate possessed at the time of its evaluation noted that Plaintiff did "not exhibit a depressed mood." (UF No. 121).

outstanding question in her favor.  By including the disputed lost wages claim in its evaluation and providing a generous allocation for general damages (despite their inherently subjective nature), Allstate was able to justify a $25,000 policy limit settlement, which it tendered to Plaintiff on May 9, 2019.  (UF No. 128)

Allstate sent a draft *Release of All Claims* to Plaintiff on May 9, 2019.  (UF No. 128).  After her counsel made some modifications to the release language (which Allstate accepted without pushback), Plaintiff signed the *Release of All Claims*, as edited by her counsel, on May 13, 2019.  (UF Nos. 129, 130).  On May 31, 2019, Allstate sent the $25,000 check to Plaintiff's counsel.  (UF No. 131).

This lawsuit followed.

## III.   PLAINTIFF'S BAD FAITH CLAIM HAS NO MERIT

Plaintiff's chief complaints regarding Allstate's claim investigation are twofold.  First, Plaintiff asserts that it was unfair for Allstate to conduct any investigation after she forwarded incomplete medical records and unverified wage loss information in February/March 2018.  Second, Plaintiff complains that Allstate's arbitration counsel (McClaugherty) was non-responsive and failed to cooperate in selecting an arbitrator.  Plaintiff claims McClaugherty's alleged lack of response and cooperation forced her to file a petition to compel arbitration in January 2019.

### A.   The Standards for Evaluating a Bad Faith Claim

Under California law, the mere fact that an insurance company withholds policy benefits that are ultimately determined to be owed does not establish a breach of the implied covenant of good faith and fair dealing.  *See Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.,* 90 Cal. App. 4th 335, 346-347 (2001), *as modified on denial of reh'g* (July 30, 2001); *Maynard v. State Farm Mut. Auto Ins. Co.*, 499 F. Supp. 2d 1154, 1160 (C.D. Cal. 2007).  Rather, to establish a breach of the implied covenant, a plaintiff must show that the insurer withheld benefits unreasonably and without proper cause.  *See Rappaport-Scott v.*

*Interinsurance Exch. of the Auto Club*, 146 Cal. App. 4th 831, 837 (2007); *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292 (2000); *Congleton v. Nat'l Union Fire Ins. Co.*, Cal. App. 3d 51, 59 (1987).

An insurer's obligations under the implied covenant of good faith and fair dealing include a duty not to unreasonably withhold benefits due under the policy. *Rappaport-Scott,* 146 Cal. App. 4th at 837 (citing *Gruenberg v. Aetna Ins. Co.,* 9 Cal. 3d 566, 575 (1973)). An insurer that unreasonably delays, or fails to pay, benefits due under the policy may be held liable in tort for breach of the implied covenant. *Chateau Chamberay*, 90 Cal. App. 4th at 346–347 (2001). Withholding benefits due under the policy may constitute bad faith only if the conduct was unreasonable and without proper cause. *Id.*

### B.   It Is Not Unreasonable to Withhold Payment Where There is a "Genuine Dispute" About the Value of the Claim

The withholding of benefits due under the policy is not unreasonable if there was a genuine dispute between the insurer and the insured as to the amount of payment due. *Rappaport-Scott,* 146 Cal. App. 4th at 837; *Chateau Chamberay,* 90 Cal. App. 4th at pp. 347–348; *Fraley,* 81 Cal. App. 4th at 1292; *Maynard,* 499 F. Supp. 2d at 1160.

In deciding whether a genuine dispute exists, "the court does not decide which party is 'right' as to the disputed matter, but only that a reasonable and legitimate dispute actually existed." *Chateau Chamberay,* 90 Cal. App. 4th at 347. In other words, establishing a "genuine dispute" does not require a showing that the insurance company was clearly right, or even that the insurance company's position was "more" correct than the insured's position. Instead, a "genuine dispute" simply means that reasonable minds could differ about the value of the claim. *See Chateau Chamberay*, 90 Cal. App. 4th at 50-51; *Rappaport-Scott*, 146 Cal. App. 4th at 839.

Whether a genuine dispute exists can and should be decided on summary judgment. *Guebara v. Allstate Insurance Co.*, 237 F. 3d 987, 992 (2001) ("Under

-14-

California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage"); *Sekera v. Allstate Ins. Co.*, 2017 U.S. Dist. LEXIS 153601, at *20 (C.D. Cal. Sept. 19, 2017) (granting summary judgment in Allstate's favor where the "dispute over causation of the knee conditions created a genuine dispute as to the value of Plaintiff's [UIM] claim"); *Myers v. Allstate Indem. Co.*, 109 F. Supp. 3d 1331, 1338 (C.D. Cal. June 16, 2015) (granting summary judgment under the genuine dispute doctrine because Allstate's dispute with the insured over the value of her UIM claim was reasonable); *see also Ives v. Allstate Ins. Co.*, 2021 U.S. Dist. LEXIS 52421, ___ F.Supp.3d ___ (C.D. Cal. 2021) (applying genuine dispute doctrine to UIM claim); *Chateau Chamberay*, 90 Cal. App. 4th at 347.

### C.   A Genuine Dispute Existed As to the Value of Plaintiff's Claim, Precluding Bad Faith Liability

The primary value driver of Plaintiff's UIM claim was her contention that she had lost in excess of $28,500 as a result of the accident ($18,500 from her magician's assistant job and $10,000 from her bakery business).  (*See* UF Nos. 54, 104).  However, the supporting documentation she provided to substantiate her loss of earnings claim was, to put it charitably, thin.  It consisted only of an email from a magician that, as far as Allstate could tell, Plaintiff *anticipated* she might have worked for as a magician's assistant, and an unverified list of payments totaling less than $3,500 that Plaintiff allegedly had to pay someone she hired to help with her bakery business.

Plaintiff provided little, if any, cooperation in Allstate's efforts to verify the lost wages claim.  Allstate asked Plaintiff to sign and return a wage authorization form on December 20, 2016, on December 21, 2016, and again on August 30, 2017. (UF Nos. 20, 21, 29).  Allstate specifically advised that it needed this form to obtain "information needed to evaluate this claim."  (*Id.*)  Allstate also asked Plaintiff, repeatedly, to provide a list of her employers so that Allstate would know who to

contact to get the missing information.  (UF Nos. 20-24, 29).  Plaintiff *never* returned her wage authorization form or identified her employers.  (UF Nos. 31, 66, 67).  Had she done so, Allstate could (and would) have gone to her employers to obtain her employment records, which could have revealed, among other things, how often she worked for each employer, how much she historically made, and what the likelihood was of Plaintiff being re-hired by each employer.  (UF No. 68).  Plaintiff's obstructionist behavior, however, prevented Allstate from obtaining this objective verification regarding the value of her claim.

Because Plaintiff's loss of earnings claim was based entirely on unverified and uncorroborated evidence, Allstate tried to get further information when it took her deposition.  Even at her deposition, however, Plaintiff was not able to state how much she actually was claiming as lost income.  (UF No. 118).

Given the lack of any objective corroborating evidence to support Plaintiff's lost wages claim, a genuine dispute existed regarding the value of her claim.  Despite the ongoing existence of that genuine dispute, however, Allstate eventually resolved the question in Plaintiff's favor to allow her to recover the policy limit. [10]

---

[10] A genuine dispute also existed with respect to the appropriate value for Plaintiff's general damages.  Putting a dollar value on pain and suffering is one of the most difficult and least precise tasks in the law.  "Translating pain and anguish into dollars can, at best, be only an arbitrary allowance, and not a process of measurement." *Beagle v. Vasold,* 65 Cal. 2d 166, 172 (1966); *accord Capelouto v. Kaiser Found. Hosp.*, 7 Cal. 3d 889, 892 (1972) (pain and suffering "can be translated into monetary loss only with great difficulty"); *Greater Westchester Homeowners Assn. v. County of Los Angeles,* 26 Cal. 3d 86, 103 (1979) (damages for pain and suffering "are inherently nonpecuniary, unliquidated and not readily subject to precise calculation.").  Thus, by its very nature, the value of general damages is subject to genuine dispute.  "The amount to be awarded [for pain and suffering] is 'a matter on which there legitimately may be a wide difference of opinion." *Seffert v. Los Angeles Transit Lines,* 56 Cal. 2d 498, 508 (1961) (citation omitted).  Even giving her credit for all her claimed medical expenses and thinly documented lost earnings, the value of Plaintiff's claim still fell short of $40,000 absent a generous allocation for general damages for pain and suffering.  This too

-16-

### D.    Allstate Did Not Unreasonably Delay the Claim

California courts have long held that "[t]here can be no 'unreasonable delay' until the insurer receives adequate information to process the claim and reach an agreement with the insured." *Globe Indemnity Co. v. Superior Court,* 6 Cal. App. 4th 725, 731 (1992); *accord Maynard,* 499 F. Supp. 2d at 1160 ("delay while the insurer seeks information and investigates the insured's claim" does not give rise to liability for bad faith).

An insurer is not obligated to pay a claim "until it [can] find out on its own, to a measure of certainty," that the benefits are owed. *Blake v. Aetna Life Ins. Co.*, 99 Cal. App. 3d 901, 924 (1979).  Thus, "[t]here can be no 'unreasonable delay' until the insurer receives adequate information to process the claim and reach an agreement with the insured." *Globe Indem. Co.*, 6 Cal. App. 4th at 731; *accord Maynard*, 499 F. Supp. 2d at 1160 (holding that "delay while the insurer seeks information and investigates the insured's claim" does not give rise to liability for bad faith).  Indeed, it is recognized that it would be "improvident" for an insurer to pay a claim before it receives information verifying the claim's value. *Blake*, 99 Cal. App. 3d at 921.

Here, while Plaintiff provided some medical and billing records and "some" documents to support her lost wages claim, her lost wages documentation was thin, to say the least.  Because Plaintiff's entitlement to the policy limit was not established, Allstate was entitled to investigate the claim without having to take Plaintiff's effectively unsubstantiated word regarding her lost income.

The claim events show that Allstate did not unreasonably delay investigating,

---

was an issue in significant dispute, particularly since Plaintiff waited 37 days after the accident to seek any medical attention, and there were several gaps in her treatment.  (UF Nos. 18, 107).  To give Plaintiff all benefits of the doubt, in its evaluation, Allstate nevertheless ultimately allocated nearly $15,000 to general damages.  (UF No. 111).  Without that generous allocation, Plaintiff's claim was not worth a policy limit settlement.

-17-

Case No. 2:20-cv-05969 JFW
ALLSTATE'S MOTION FOR SUMMARY JUDGMENT

evaluating, and settling the claim.  To the contrary, Allstate was proactive in gathering information and evaluating the claim at all opportunities.  Allstate conducted written discovery.  (UF No. 96).  Shortly after receiving Plaintiff's written discovery responses in October 2018, Allstate subpoenaed each of her newly-identified medical providers for documents.  (UF No. 101).  Allstate did not have all of the necessary information to evaluate Plaintiff's claim until at least January 29, 2019, when it received all of the subpoenaed medical and billing records.  (UF No.105).  Shortly after receiving those records, Allstate performed an evaluation.[11]  (UF No. 106).  Allstate cannot be liable for bad faith as a matter of law while it was duly investigating Plaintiff's claim.

Because Plaintiff's lost wages claim was based on her own uncorroborated statements and she failed to return the wage authorization form or provide any other objective evidence (i.e., tax returns or bank statements) corroborating her claimed damages, Allstate needed to depose Plaintiff.  No benefits for lost wages could have been due before it was able to take her deposition.  (*See* UF No. 6).  Allstate began attempting to take Plaintiff's deposition in August 2018.  Due to scheduling conflicts attributable to both sides, Allstate was unable to take the deposition until March 7, 2019.  Even at her deposition, however, Plaintiff was unable to verify the lost wages she was claiming.  (UF No. 118).  Allstate nevertheless resolved all disputes regarding Plaintiff's speculative and still uncorroborated lost wages claim fully in her favor, gave her a generous allocation for general damages in order to justify the policy limit payment, and settled the matter within two months after her

---

[11] The information Plaintiff provided was incomplete even at the time Allstate performed its evaluation in February 2019.  Plaintiff has produced in this litigation in response to Allstate's document requests over 540 pages of bank account records and regarding her lost bakery jobs to document her loss of wages claim, none of which she provided to Allstate in connection with Allstate's investigation of the underlying claim (UF No. 132), even though they would have been relevant to her lost wages claim.

1   deposition.  (UF Nos. 127, 128).  As the undisputed timeline establishes, Allstate did
2   not unreasonably delay the resolution of the claim.

3        **E.**     **Plaintiff's Failure to Return Requested Wage Authorization Forms Precludes Any Recovery**

4          To the extent there were any delays, they fall squarely on Plaintiff, in that she
5   delayed returning her signed medical authorization for 14 months after Allstate
6   initially requested it and *never returned her wage authorization or employer*
7   *information forms*.  (UF Nos. 30, 31, 66, 67).  Plaintiff hindered Allstate's
8   investigation by doing so, as Allstate could not legally contact Plaintiff's employers
9   without her written authorizatoin.  Moreover, Insurance Code § 11580.2(o) requires
10  an insured to provide medical and wage authorizations, and stays all proceedings,
11  and entitlement to policy benefits, until 30 days after that requirement is met.  Cal.
12  Ins. Code, § 11580.2(o).  Consequently, Plaintiff never became entitled to *any*
13  policy benefits because of her failure to ever return the wage authorization.[12]
14  *Myers*, 109 F. Supp. 3d 1336-1337 ("It is axiomatic that 'a bad faith claim cannot be
15  maintained unless policy benefits are due.' [citation omitted] [The insured's] failure
16  to provide the requested medical authorization negated her entitlement to the
17  *arbitration*, let alone to any benefits due to her following the arbitration award.")
18  (emphasis in original)); *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1152-53
19  (1990) (there can be no bad faith for delaying the payment of benefits that are not
20  yet owed).  This is a further independent reason Plaintiff's bad faith claim fails as a
21  matter of law.

22       **F.**     **Allstate Did Not Engage In Bad Faith Conduct By Asking Plaintiff For A Release**
23

24         Plaintiff also complains that Allstate sent her a release that "proposed…

25

---

26  [12] Putting aside Plaintiff's failure to ever return a wage authorization form, she did
27  not even return the medical authorization form until February 22, 2018, meaning
    that her entitlement to any policy benefits was stayed at a minimum until March 22,
28  2018 (30 days after she returned the form).  Cal. Ins. Code, § 11580.2(o).

language releasing Plaintiff's extra-contractual claims." (Complaint, ¶ 30). She concedes, however, that her counsel "corrected" the release and that Allstate paid her the policy limit on her claim without demanding that its proposed language be reinserted. (*Id.*, ¶¶ 31, 32). As a matter of law, there is nothing inherently wrong with an insurer seeking a release of all claims, including extra-contractual claims, in connection with a settlement, especially when the settlement represents a compromise by the insurer. *Gellis v. Allstate Ins. Co.*, 1999 U.S. Dist. LEXIS 15596, at *24 (C.D. Cal. Sept. 27, 1999) (Allstate was "within its rights" in seeking to have plaintiff waive any future bad faith claim, even if such negotiations resulted in delay, since plaintiff was represented by counsel at the time Allstate presented the release); Cal. Code Reg. § 2695.4(e)(1). Regardless, it is undisputed that Allstate did not provide any push back and promptly paid Plaintiff's claim in full even though Plaintiff's counsel removed Allstate's proposed provision regarding her extra-contractual claims.

### G.  The Parties' Inability to Agree Upon an Arbitrator Does Not Constitute Bad Faith

Plaintiff complains that Allstate's arbitration counsel acted in bad faith during the underlying UIM arbitration proceedings as a result of the parties' inability to agree upon an arbitrator and purported delays regarding that procedural matter. (Complaint, ¶¶ 19, 25). As a preliminary matter, no evidence supports this contention. The undisputed evidence reflects that McClaugherty and Plaintiff's counsel exchanged letters back and forth several times between May and November, 2018 in an attempt to agree upon an arbitration. (UF Nos. 84, 86, 87, 90). They were simply unable to reach an agreement.

Regardless, arbitration counsel's conduct falls well within the litigation privilege and thus, the arbitration-related conduct about which Plaintiff complains cannot serve as the basis for bad faith liability. *Collins v. Allstate Indem. Co.*, 2010 U.S. Dist. LEXIS 2144, at *11 (N.D. Cal. Jan. 12, 2010) (granting Allstate's motion

to dismiss because "Plaintiff's bad faith clam fails to state a claim because it is predicated on [UM arbitration] conduct that is subject to the litigation privilege set forth in California Civil Code section 47(b)."), *aff'd Collins v. Allstate Indem. Co.*, 428 Fed. Appx. 688 (9th Cir. 2011); *see also Mallard v. Progressive Choice Ins. Co.*, 188 Cal. App. 4th 531 (2010).

## IV.   THE CLAIM AGAINST ALLSTATE INSURANCE COMPANY FAILS

Plaintiff has not just sued Allstate Fire & Casualty, the company that issued her policy.  For reasons that are unclear, she has also sued Allstate Insurance Company, a separate entity with whom she has no contractual relationship.  That uninvolved entity was improperly named and should be dismissed.

The implied covenant of good faith and fair dealing exists only to prevent one *contracting party* from unfairly frustrating the other party's right to receive the benefits of the agreement actually made.  *See Avidity Partners, LLC v. State of Cal.*, 221 Cal. App. 4th 1180, 1204 (2013).  As applied to automobile insurance policies, there can be no breach of the implied covenant where there is no breach of the terms of the policy in which that covenant is implied.  To state a bad faith claim, a plaintiff must thus first establish that benefits were due under the policy.  *Waller v. Truck Ins. Exch.*, 11 Cal. 4th 1, 35-37 (1995) ("[B]ecause a contractual obligation is the underpinning of a bad faith claim, such a claim cannot be maintained unless policy benefits are due under the contract."); *Love v. Fire Ins. Exchange*, 221 Cal. App. 3d 1136, 1153 ("[A] bad faith claim cannot be maintained unless policy benefits are due.").  Thus, absent a contractual right to policy benefits, "the implied covenant has nothing upon which to act as a supplement, and 'should not be endowed with an existence independent of its contractual underpinnings.'"  *Waller*, 11 Cal. 4th 1, 35-36.  Therefore, where the terms of an insurance policy are not breached "there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer."  *Id*. at 36; *see also*, *Everett v. State Farm Gen. Ins. Co.*, 162

Cal.App.4th 649, 664 (2008) ("Because there was no breach of contract, there was no breach of the implied covenant.  Accordingly, summary judgment as to this cause of action was proper."); *Gunderson v. Fire Ins. Exch.*, 37 Cal.App.4th 1106, 1119 (1995) ("Because there was no breach of the insurance contract, appellants' bad faith claim also fails.").

Here, it is undisputed that Allstate Fire & Casualty Company issued Plaintiff's policy; defendant Allstate Insurance Company is not a party to the insurance contract.  (UF Nos. 1, 133).  Allstate Insurance Company thus owed no duties to Plaintiff under the Policy.  Because Allstate Insurance Company did not – and could not have – breached the Policy, it likewise cannot be liable for bad faith as a matter of law.

## V.    THE PUNITIVE DAMAGES CLAIM FAILS AS A MATTER OF LAW

Regardless of how the Court rules on Plaintiff's bad faith claim, it should eliminate her claim for punitive damages because she has no evidence to support it.  Several standards governing punitive damages apply here.  First, to recover punitive damages, Plaintiff must provide clear and convincing evidence of fraud, oppression or malice.  Cal. Civ. Code § 3294.

- "Fraud" is "an intentional misrepresentation, deceit or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3).

- "Oppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of the person's rights." Cal. Civ. Code § 3294(c)(2).  "Despicable conduct" is conduct "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." *Stewart v. Truck Ins. Exch*, 17 Cal. App. 4th 468, 483 n. 29 (1993).

- "Malice" means either (1) "conduct which is intended by the defendant to cause injury to the plaintiff or (2) "despicable conduct which is carried on by the defendant with a willful and conscious disregard for the rights or safety of others." Cal. Civ. Code § 3294(c)(1).  "Evil motive is the central element of the malice which justifies an exemplary award." *O'Hara v. Western Seven*, 75 Cal. App. 3d 798, 806 (1977).

Second, on summary judgment, the court must test a punitive damages claim under the heightened "clear and convincing evidence" standard.  *Anderson v. Liberty Lobby Inc.*, 411 U.S. 242, 254 (1986) ("in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden"); *Board of Trustees of Univ. of Illinois v. Insurance Corp. of Ireland*, 969 F. 2d 329, 332 (7th Cir. 1992) (applying "clear and convincing" standard on motion for summary judgment).  Thus, to survive summary judgment, Krupka must present evidence for punitive damages that is strong enough to command "the unhesitating assent of every reasonable mind." *In re Angelia P.*, 28 Cal. 3d 908, 919 (1981).

Third, "the evidence required to support an award of punitive damages for breach of the implied covenant of good faith and fair dealing is 'of a different dimension' from that needed to support a finding of bad faith." *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg.*, 78 Cal. App. 4th 847, 909-10 (2000) (citation omitted).  Evidence of bad faith - without more - does not support a claim for punitive damages. *Beck v. State Farm*, 54 Cal. App. 3d 347, 355-56 (1976); *Stewart*, 17 Cal. App. 4th at 483.

Fourth, the evidence must not be merely consistent with the theory of oppression, fraud, or malice.  Rather, Plaintiff  must produce evidence that is inconsistent with any other explanation: "some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other

1  such non-iniquitous human failing." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.
2  App. 4th 1269, 1287-88 n. 14 (1994).

3      Finally, a plaintiff seeking punitive damages against a corporation must show
4  by clear and convincing evidence that the act constituting malice or oppression was
5  committed or ratified by an "officer, director, or managing agent." *Cruz v.
6  HomeBase*, 83 Cal. App. 4th 160, 163 (2000); *White v. Ultramar, Inc.*, 21 Cal. 4th
7  563 (1999).

8      Here, Plaintiff cannot meet these strict standards.  There is no evidence -
9  much less clear and convincing evidence - of malice, oppression, fraud.  Rather,
10 Allstate was presented with a claim that raised significant valuation questions but
11 nevertheless resolved the dispute in Plaintiff's favor after advising her she could
12 increase her demand by $15,000.  Further, Plaintiff cannot show ratification of any
13 malicious, fraudulent or oppressive act by a managing agent.  Therefore, the Court
14 should grant partial summary judgment on the claim for punitive damages.

15 ## VI.    CONCLUSION

16     Allstate respectfully requests that the Court grant full summary judgment.
17 Alternatively, Allstate requests that the Court grant partial summary judgment on
18 Plaintiff's punitive damages claims.

19 Dated:  April 12, 2021

20                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

22          By:    _____
23                          MADALYN A. MACARR
24                          Attorneys for Defendants
                       Allstate Insurance Company and Allstate Fire
25                          & Casualty Insurance Company