1

2

3

4

5

6

7

8

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13   JACLYN A. KERRIGAN,                    Case No. 2:20-cv-05969 JFW

14             Plaintiff,                   [*The Hon. Judge John F. Walter*]
                                            [*Magistrate Judge Maria A. Audero*]
15        v.

16   ALLSTATE INSURANCE                     **STATEMENT OF DECISION**
     COMPANY, ALLSTATE FIRE &
17   CASUALTY INSURANCE
     COMPANY, and DOES 1-50,
18   Inclusive,

19             Defendants.

20

21

22

23

24

25

26

27

28

# I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

After recovering the $25,000 policy limits on her claim for underinsured motorist ("UIM") benefits, Plaintiff Jaclyn Kerrigan ("Plaintiff") sued Defendants Allstate Insurance Company ("Allstate Insurance") and Allstate Fire & Casualty Insurance Company ("Allstate Fire") (collectively, "Defendants") for engaging in bad faith in connection with her insurance claim.  The sole issue in this action is whether Defendants unreasonably delayed paying Plaintiff the UIM policy limit.

## A.    Plaintiff's Allstate Fire Automobile Policy

Allstate Fire issued a Nevada auto policy, Policy Number 916389220 (the "Policy"), to Plaintiff that included UIM coverage in the amount of $25,000 per person and $50,000 per accident.  (CS Nos. 1 and 2).  The Policy required Plaintiff to cooperate and provide information requested by Allstate Fire, "including all details reasonably required by [Allstate Fire] to determine the amounts payable." (CS No. 4).  The Policy also required Plaintiff to authorize Allstate Fire to obtain her "medical reports and copies of records" and to submit to questioning under oath. (CS Nos. 5 and 6).  In addition, the Policy provided that Plaintiff could not sue Allstate Fire unless she had fully complied with all Policy terms.  (CS No. 7).

Plaintiff admits that Allstate Insurance is not a party to the insurance policy issued by Allstate Fire.  (Combined Statement of Facts ("CS") No. 133).  Plaintiff also did not oppose and, thus, concedes, Defendants' argument that because Allstate Insurance was not a party to the insurance policy at issue in this action it was improperly named and should be dismissed.  *See, e.g., Cruz-Sanchez v. National Railroad Passenger Corp.*, 2018 WL 6017034 (C.D. Cal. June 8, 2018) (granting

---

[1]    To the extent any of these facts are disputed, they are not material to the disposition of this motion. In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

1  Amtrak's motion for summary judgment with respect to premises liability where
2  "Plaintiff offers no arguments as to why Amtrak may be liable on a premises
3  liability theory" and holding that "Plaintiff's failure to respond to it warrants
4  granting the Amtrak Motion as to the premises liability claim"); *see also Walsh v.*
5  *Nevada Dept. of Human Resources,* 471 F.3d 1033, 1037 (9th Cir. 2006) (holding
6  that plaintiff who failed to address issues raised in a defendant's motion to dismiss in
7  his opposition brief "has effectively abandoned his claim, and cannot raise it on
8  appeal"); *Conservation Force v. Salazar*, 677 F. Supp. 2d 1203, 1211 (N.D. Cal.
9  2009) ("Where plaintiffs fail to provide a defense for a claim in opposition, the
10  claim is deemed waived") (*citing Locricchio v. Office of U.S. Trustee*, 313 Fed.
11  Appx. 51, 52 (9th Cir. 2009)).  Accordingly, Allstate Insurance is **DISMISSED**
12  from this action.

13  **B.**     <u>**Plaintiff's Accident and UIM Claim**</u>

14          On October 9, 2016, Plaintiff was involved in an automobile accident in Las
15  Vegas, Nevada while her then-boyfriend, Derek Dodel ("Dodel"), was driving
16  Plaintiff's car and Plaintiff was riding as a passenger.  (CS No. 9).  Plaintiff and
17  Dodel were rear-ended while stopped at a red light at an intersection.  (CS No. 10).
18  It is undisputed that Plaintiff's vehicle did not spin as a result of the accident (CS
19  No. 11), the airbags in Plaintiff's vehicle did not deploy (CS No. 12), and no
20  ambulance was called to the scene (CS No. 13).  Although the police were called,
21  they never reported to the scene (CS No. 14), and Plaintiff and the at-fault driver
22  were both able to drive their respective vehicles away from the accident site (CS
23  Nos. 15 and 16).  Plaintiff testified at her deposition in the UIM arbitration
24  proceedings that at the time of the accident, the "actual impact . . . didn't feel
25  extreme."  (CS No. 17).  Indeed, Plaintiff waited thirty-seven days before receiving
26  any medical treatment for injuries she allegedly sustained in the accident.  (CS No.
27  18).

28

SMRH:4814-7003-4406.2                                                    STATEMENT OF DECISION

1   Plaintiff was not eligible for UIM coverage until she exhausted the other

2   driver's insurance coverage.  On December 18, 2017, over fourteen months after the

3   accident and with the assistance of her attorney, Plaintiff received the $15,000

4   policy limits from the other driver's insurance for her injuries.  (CS No. 32).

5   Plaintiff was satisfied with the way her claim was handled.  (CS No. 33).

6   On December 6, 2017, Plaintiff's counsel, Derek L. Tabone ("Tabone") made

7   a written demand to Allstate Fire that it pay $2,000 in medical benefits and $10,000

8   "policy limits" under the Policy's UIM coverage.  (CS No. 34).  Tabone's letter did

9   not specify the nature or extent of Plaintiff's injuries, how much she had incurred in

10   medical expenses, or whether she was claiming any lost wages.  Instead, Plaintiff's

11   counsel merely expressed that he "believe[d] Ms. Kerrigan's 'claim' has a value in

12   excess of $100,000" based on his "view of the significance of my client's injuries

13   and their permanent nature."  (*Id.*)  Tabone's letter did not include any documents

14   suggesting Plaintiff's injuries were permanent.  (*See id.*).  Tabone's initial letter also

15   failed to include *any* supporting documentation (*e.g.*, medical records, bills, or wage

16   loss documentation) to support Plaintiff's claim.  (CS No. 37).  At the time Plaintiff

17   submitted her December 6, 2017 demand for $10,000 in UIM "policy limits,"

18   Plaintiff was unaware that her policy did not require a UIM coverage limit reduction

19   for the amount recovered from the at-fault driver.  (CS Nos. 35 and 36).

20   On December 13, 2017, Allstate Fire acknowledged receipt of Tabone's

21   December 2017 demand letter and noted that Allstate Fire "only received your

22   demand letter and the release from the liability carrier.  We require medical records

23   and itemized (and properly coded) bills . . . Until we receive these items our adjuster

24   will not be able to complete the evaluation."  (CS No. 38)

25   On December 14, 2017, Allstate Fire received a letter from Plaintiff's counsel

26   dated December 11, 2017 which enclosed medical bills totaling $11,634, and

27   records indicating Plaintiff had suffered soft tissue injuries as a result of the

28   accident.  (CS Nos. 39, 40).  "Allstate [Fire] promptly paid the $2,000 in med-pay

-3-

1    benefits" (Complaint, ¶ 15), thereby exhausting the available coverage limit by

2    December 29, 2017.  (CS Nos. 41, 42).

3             **C.**      <u>**Allstate Fire's Investigation of Plaintiff's UIM Claim**</u>

4         Allstate Fire received notice of the loss shortly after the accident, and Allstate

5    Fire immediately began efforts to investigate Plaintiff's claim.  On December 20,

6    2016 and again on August 30, 2017, Allstate Fire sent Plaintiff a "Notice of Claim"

7    form to complete, sign, and return.  (CS Nos. 19, 27).  Among other things, the

8    claim form sought basic information about Plaintiff's medical providers, occupation,

9    and wages.  (*Id.*)  Plaintiff never returned the form.  (CS No. 28).

10        On December 20, 2016, December 21, 2016, and August 30, 2017, Allstate

11    Fire sent and asked Plaintiff to sign and return medical and wage authorization

12    forms, which were necessary to enable Allstate Fire to obtain relevant records from

13    Plaintiff's health care providers and employers.  Allstate Fire also requested that

14    Plaintiff complete and return forms identifying her medical providers and

15    employers.  (CS Nos. 20, 21, 29).  Plaintiff did not return the medical authorization

16    form until February 22, 2018, fifteen months later. (CS No. 61).  On March 14,

17    2018, Plaintiff provided an incomplete list identifying only two of her medical

18    providers.  (CS Nos. 71, 72, 100).  Plaintiff never returned the wage authorization

19    form (CS No. 31) and never returned the employer identification form.  (CS No. 67).

20        On March 2, 2017, May 9, 2017, and July 14, 2017, Allstate Fire wrote to

21    Plaintiff asking for information to support her "wage loss" claim, specifically

22    including "the most current information you have" regarding her "employer,

23    duration, salary."  (CS Nos. 22-24).

24        On December 11, 2017, as discussed above, Plaintiff's counsel sent a letter to

25    Allstate Fire in connection with Plaintiff's claim for $2,000 in maximum medical

26    payment benefits under her Policy and attached medical bills totaling $11,634 and

27    records indicating Plaintiff had suffered minor soft tissue injuries as a result of the

28    accident (CS Nos. 39 and 40).  Allstate Fire paid the $2,000 in medical benefits by

December 29, 2017.  On January 23, 2018, Plaintiff's counsel emailed Allstate Fire additional medical bills and records and claimed that Plaintiff's expenses were ongoing.  (CS No. 44).   Plaintiff's counsel claimed – without support, further elaboration, or any documentation – that Plaintiff's "bakery job is also suffering losses due to her not being able to perform as fast and efficient as she could before." (CS Nos. 45, 46).

On January 29, 2018, Allstate Fire sent a letter advising that certain medical records were missing and that until Allstate Fire received the missing records, it would be "unable to fairly evaluate this demand."  (CS No. 47).  Plaintiff admits that Allstate Fire only had partial medical records as of the date of the letter.  (CS Nos. 48, 49).  On February 9, 2018, Plaintiff's counsel provided Allstate Fire with copies of "some of Ms. Kerrigan's documents that support her loss [*sic*] wages claim."  (CS No. 52).  One of the documents sent to Allstate Fire by Plaintiff's counsel was an unsworn statement (an email) from Chris Mitchell ("Mitchell"), a magician, dated August 27, 2017.  Mitchell identified fifteen contortionist and magician's assistant engagements that Plaintiff purportedly lost after the accident due to her injuries. (CS No. 53).  Mitchell estimated, without any explanation, that this amounted to a total loss of income of $18,500.  (CS No. 54).  Plaintiff also included with her February 9, 2018 letter an unverified list of payments totaling $2,452.98, which Plaintiff claimed she had to pay the person she hired to assist in her bakery business. (CS No. 55).  Finally, Plaintiff included evidence of a $225 refund she purportedly returned to a bakery client because she was "unable to complete the job due to her injuries."  (CS No. 56).

Allstate Fire concluded that this unverified and incomplete information was insufficient to conduct a reasonable evaluation of Plaintiff's actual wage loss.  On February 12, 2018, Allstate Fire emailed Plaintiff's counsel and explained that it needed additional information to substantiate Plaintiff's lost earnings claim.  (CS No. 57).  Allstate Fire also asked for Plaintiff's pre-accident medical records so that

1   it could evaluate whether her claimed injuries were in fact caused by the accident.

2   (CS No. 58).  Allstate Fire explained that it was "unable to complete the UIM

3   evaluation pending receipt of the requested information."  (CS No. 59).

4           Plaintiff's counsel responded on February 22, 2018, by returning Plaintiff's

5   medical authorization form that Allstate Fire had requested fifteen months earlier.

6   However, Plaintiff did not provide any additional documentation supporting her lost

7   earnings and only referenced the $18,500 allegedly lost from the magician's

8   assistant and contortionist jobs identified in the email from Mitchell.  (CS No. 62).

9   Instead, Plaintiff's counsel provided his personal estimate that the "block of

10  approximately 30 performances . . . averages about $600 per performance."  (*See*

11  *id.*).  Plaintiff's counsel did *not* provide a list of employers or the wage authorization

12  form that Allstate Fire had repeatedly requested, which would have enabled Allstate

13  Fire to contact and obtain wage information from Plaintiff's employer(s).  (CS No.

14  65).

15          On February 23, 2018, Allstate Fire advised Plaintiff's counsel that it

16  "require[d] a list of providers that [Plaintiff] treated at for the last 5 years."  (CS No.

17  69).  Plaintiff admits this request was reasonable.  (CS No. 70).  On March 14, 2018,

18  Plaintiff's counsel returned Plaintiff's Medical Provider Information form.  (CS No.

19  71).  The form identified only two providers, West Oaks Urgent Care and Planned

20  Parenthood, neither of which Plaintiff had seen for any injuries relating to her

21  accident.  (CS Nos. 72, 73).  Plaintiff's counsel also included receipts for new

22  clothing, including thirty new dresses for "the new wardrobe our client needed to

23  purchase to continue her magician assistant jobs" because Plaintiff had gained some

24  weight due to her injuries.  (CS No. 74).  Plaintiff's counsel also attached an update

25  to the list of payments Plaintiff made to her bakery assistant, adding $764.00 to her

26  previous claim for a total of $3,216.98, representing payments from December 11,

27  2016 through February 17, 2018.  (CS No. 75).

28

SMRH:4814-7003-4406.2                                              STATEMENT OF DECISION

On March 22, 2018, Allstate Fire contacted West Oaks Urgent and Planned Parenthood to obtain the necessary records to evaluate Plaintiff's claim.  (CS No. 77).

### D.    Plaintiff Demands Arbitration

On April 4, 2018, Allstate Fire sent Plaintiff's counsel a letter confirming that it was still waiting on necessary documents from Plaintiff.  On April 13, 2018, Plaintiff's counsel responded by referencing his initial demand for the UIM limit of $10,000 made on December 6, 2017 and making a formal demand for arbitration.

### E.    Allstate Fire Informs Plaintiff She Can Increase Her Demand By $15,000

During the course of its investigation, Allstate Fire determined that, under Plaintiff's Nevada policy, Plaintiff's $25,000 UIM policy limit was not reduced by the $15,000 she had received from the other driver.  Therefore, on April 18, 2018, Allstate Fire advised Plaintiff's counsel about its discovery and that "[t]he $25k UIM limits are available on top of the tort limit." (CS No. 81).  In other words, Allstate Fire advised Plaintiff's counsel that Plaintiff could claim $15,000 more in policy benefits than Plaintiff's counsel originally demanded.  (CS No. 82). Plaintiff's counsel revised the demand to $25,000 based on the information Allstate Fire provided.  (*Id.*).

### F.    The Parties Attempt to Agree on an Arbitrator

Because Plaintiff had demanded arbitration, Allstate Fire promptly assigned the matter to McClaugherty & Associates ("McClaugherty") to represent Allstate Fire in the UIM arbitration proceedings. (CS No. 83). Plaintiff's counsel and McClaugherty exchanged a series of letters between May and November 2018 regarding proposed arbitrators. (CS Nos. 84-87 and 90). Among the arbitrators McClaugherty proposed was Robert Tessier ("Tessier"). (CS No. 88).  Plaintiff's counsel rejected all of McClaugherty's proposed arbitrators. (CS No. 89). On January 21, 2019, Plaintiff filed a petition to compel arbitration in the Los Angeles

-7-

Superior Court. (CS No. 92). Allstate Fire did not oppose Plaintiff's petition and, instead, joined in Plaintiff's request for "the Court's assistance in the selection of a neutral arbitrator," because "both parties have had difficulty in coming to an agreement of a neutral arbitrator." (CS No. 93). On March 1, 2019, the Los Angeles Superior Court granted Plaintiff's petition and appointed Tessier, one of the arbitrators McClaugherty had proposed several months earlier. (CS Nos. 88 and 94). The parties later learned that, notwithstanding the Court's appointment of Tessier as the arbitrator, Tessier only performed mediations, not arbitrations. (CS No. 95). After discovering this limitation on Tessier's services, McClaugherty and Plaintiff's counsel were able to select an alternative mutually agreeable arbitrator. (*Id*.).

### G.    Allstate Fire Continues Investigating Plaintiff's UIM Claim

While the parties were trying to agree on an arbitrator, the parties engaged in discovery in connection with the UIM arbitration. Each party propounded and responded to written discovery. (CS No. 96). After requesting and receiving an extension of time to respond to Allstate Fire's written discovery, Plaintiff provided her responses on October 16, 2018. (CS Nos. 97 and 98). In her interrogatory responses, Plaintiff identified five additional medical providers she had not previously disclosed on the Medical Provider Identification form she provided in March 2018. (CS Nos. 99 and 100). Immediately after receiving Plaintiff's discovery responses, on October 19, 2018, Allstate Fire issued subpoenas for their medical and billing records.[2] (CS No. 101).

---

[2]     Among the providers identified for the first time in Plaintiff's form interrogatory responses as a provider who purportedly treated her for accident-related injuries was her therapist, Sharon Gedan ("Gedan"). Allstate Fire subpoenaed records from Gedan in connection with its investigation of the underlying claim. (CS No. 102). In response, Allstate Fire received only a single progress note indicating Plaintiff had seen Gedan a total of three times, for forty-five minutes each session, seeking "support and guidance

In her October 2018 discovery responses, Plaintiff also claimed, for the first time, that as a result of the accident, she sustained losses in excess of $10,000 attributable to her bakery business.  (CS No. 104).  However, the only documentation provided to Allstate Fire regarding Plaintiff's claimed losses from her bakery business was an unverified list of payments Plaintiff purportedly paid to her bakery assistant totaling $3,216.98 and the $225 refund receipt.

On January 29, 2019, Allstate Fire received all of the subpoenaed medical and billing records.  (CS No. 105).  Shortly after receiving those records, Allstate Fire prepared a Calendar Report[3] and Claim Detail Report, and also ran Plaintiff's medical bills through a bill review software program to verify that the charges were reasonable.  (CS No. 106).  On February 25, 2019, Allstate Fire performed a preliminary evaluation to determine whether Plaintiff would be entitled to the policy limit *if* the lost earnings claim could be verified at Plaintiff's upcoming deposition.  (CS No. 108).  As of the date Allstate Fire performed its preliminary evaluation, Plaintiff still had not provided any documentation to verify her lost earnings claim other than the single email from Mitchell and the list of payments for the bakery assistant.  (CS No. 76, 112, and 126).   For purposes of its preliminary evaluation, Allstate Fire assumed Plaintiff would be able to demonstrate at least half of her claimed lost earnings damages, even though the losses remained unverified.  (CS No. 113).  Allstate Fire's preliminary evaluation noted the one month gap from the date of the accident until Plaintiff sought medical treatment as well as other gaps during her treatment (CS No. 109), and noted that the "wage loss is soft and not well supported."  (CS No. 110).  The preliminary evaluation allocated $16,593.88 to

---

concerning the ending of a recent relationship which she describes as the most meaningful she ever had."  (CS No. 103).

[3]  The Calendar Report logged each of Plaintiff's medical visits and reflected that Plaintiff had a ten week gap in treatment from April to June 2017.  (CS No. 107).

STATEMENT OF DECISION

medical expenses, $11,702.98 to lost wages, $3,500 to $5,000 to general damages, and $7,300 to $8,700 as "value drivers" based on the nature of Plaintiff's job as a contortionist and pastry chef.  (CS No. 111).  The preliminary evaluation resulted in a total settlement range of $22,068.72 to $24,996.86 after accounting for the $15,000 damages offset and $2,000 in medical payment benefits paid by Allstate Fire.  (*Id.*).

Given the unverified nature of Plaintiff's wage loss claim, Allstate Fire determined that deposing Plaintiff was critical to its evaluation of Plaintiff's claim. On August 27, 2018, Allstate Fire noticed Plaintiff's deposition for October 24, 2018.  (CS No. 114).  Two days before the deposition, Plaintiff's counsel demanded that the deposition be rescheduled due to a calendar conflict.  (CS No. 115).  After further scheduling issues delayed the deposition, Allstate Fire eventually deposed Plaintiff on March 7, 2019.  (CS No. 117).  At her deposition, Plaintiff was not able to quantify her lost earnings claim and insisted that it was "really hard to say" how much future loss of income she expected.  (CS No. 118).

Plaintiff also testified that she had experienced severe depression as a result of the accident.  (CS No. 119).  Plaintiff's deposition testimony raised a new type of damages purportedly attributable to the accident that had not been previously disclosed in her medical records.  (CS No. 120).  Indeed, Plaintiff's medical records that Allstate Fire had obtained at the time of its preliminary evaluation noted that Plaintiff did "not exhibit a depressed mood."  (CS No. 121).

## H.    Allstate Fire Resolves the Claim in Plaintiff's Favor

Due to her inability to produce employment records or quantify her actual lost wages at her deposition, Plaintiff's lost wages claim remained unverified.  However, instead of simply rejecting the lost wages claim based on an absence of proof, Allstate Fire decided to resolve the issue in her favor.  By including the disputed lost wages claim in its evaluation and providing a generous allocation for general damages (despite their inherently subjective nature), Allstate Fire was able to justify

1  a $25,000 policy limit settlement, which it tendered to Plaintiff on May 9, 2019.

2  (CS No. 128).

3      Allstate Fire sent a draft *Release of All Claims* to Plaintiff on May 9, 2019.

4  (CS No. 128).  After Plaintiff's counsel made minor modifications to the release

5  language (which Allstate Fire accepted), Plaintiff signed the *Release of All Claims*,

6  as modified by her counsel, on May 13, 2019.  (CS Nos. 129-30).  On May 31,

7  2019, Allstate Fire sent the $25,000 check to Plaintiff's counsel.  (CS No. 131).

8              **I.     Procedural History**

9      On May 27, 2020, Plaintiff filed a Complaint against Defendants in Los

10  Angeles Superior Court, alleging a single claim for tortious breach of insurance

11  contract.  In her Complaint, Plaintiff alleges that Allstate Fire has "unreasonably and

12  without just cause (and thus tortuously) withheld and delayed payment of benefits to

13  Plaintiff to which she was entitled."  Complaint, ¶ 34.  On July 2, 2021, Defendants

14  removed this action to this Court.

15  **II.   LEGAL STANDARD**

16      Summary judgment is proper where "the movant shows that there is no

17  genuine dispute as to any material fact and the movant is entitled to judgment as a

18  matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of

19  demonstrating the absence of a genuine issue of fact for trial.  *See Anderson v.*

20  *Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party meets its

21  burden, a party opposing a properly made and supported motion for summary

22  judgment may not rest upon mere denials but must set out specific facts showing a

23  genuine issue for trial.  *Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*,

24  880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be

25  defeated by relying solely on conclusory allegations unsupported by factual data.").

26  In particular, when the non-moving party bears the burden of proving an element

27  essential to its case, that party must make a showing sufficient to establish a genuine

28  issue of material fact with respect to the existence of that element or be subject to

-11-

summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case."  *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party.  *Anderson*, 477 U.S. at 248.  "This requires evidence, not speculation."  *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999).  The Court must assume the truth of direct evidence set forth by the opposing party.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).  However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom.  *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987).  Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party."  *American International Group*, 926 F.2d at 836-37.  In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III.   DISCUSSION

In its Motion, Allstate Fire seeks summary judgment on Plaintiff's claim for tortious breach of insurance contract, or "bad faith," on the grounds that: (1) there

1   was a genuine dispute as to the value of Plaintiff's claim; and (2) Allstate Fire did
2   not unreasonably delay during its investigation of Plaintiff's claim.[4]

3        **A.**    <u>**Legal Standard Governing Bad Faith Claims**</u>

4          All insurance contracts in California include the implied covenant of good
5   faith and fair dealing.  *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 573 (1973).
6   "When benefits are due an insured, delayed payment based on inadequate or tardy
7   investigations, oppressive conduct by claims adjusters seeking to reduce the
8   amounts legitimately payable, and numerous other tactics may breach the implied
9   covenant[.]" *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 36 (1995) (citation
10  and internal quotation marks omitted).  To succeed on a bad faith claim, the insured
11  must demonstrate that: (1) benefits due under the policy were withheld; and (2) the
12  reason for withholding benefits was unreasonable or without proper cause.  *Wilson*
13  *v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 721 (2007).

14         In addition, even where benefits are due under the policy, withholding them is
15  not bad faith "if the insurer conducts a 'thorough and fair' investigation, after which
16  there remained a 'genuine dispute' as to coverage liability."  *Bravo v. U.S. Life Ins.*
17  *Co. in City of N.Y.*, 701 F. Supp.2d 1145, 1159 (E.D. Cal. 2010) (citation omitted).
18  In deciding whether a genuine dispute exists, "the court does not decide which party
19  is 'right' as to the disputed matter, but only that a reasonable and legitimate dispute
20  actually existed."  *Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins.*
21  *Co.,* 90 Cal. App. 4th 335, 347 (2001).  In other words, establishing a "genuine
22  dispute" does not require a showing that the insurance company was clearly right, or
23  even that the insurance company's position was "more" correct than the insured's

24  _____

25  [4]    Allstate Fire also moves for summary judgment on the grounds that its
26      request that Plaintiff sign a release does not demonstrate bad faith and the
    parties' delay in agreeing to an arbitrator for the UIM arbitration is not bad
27      faith.  However, Plaintiff concedes in her Opposition that Allstate Fire's
    alleged bad faith did not arise "from these two side issues" and that "the
28      release did not hurt Plaintiff."  Opposition, pp. 14-15.

SMRH:4814-7003-4406.2                                      STATEMENT OF DECISION

1   position.  Instead, a "genuine dispute" simply means that reasonable minds could
2   differ about the value of the claim.  *See Chateau Chamberay*, 90 Cal. App. 4th at
3   50-51; *Rappaport-Scott v. Interinsurance Exchange of the Automobile Club*, 146
4   Cal. App. 4th 831, 839 (2007).

5          "While the reasonableness of an insurer's claims-handling conduct is
6   ordinarily a question of fact, it becomes a question of law where the evidence is
7   undisputed and only one reasonable inference can be drawn from the evidence."
8   *Chateau Chamberay*, 90 Cal. App. 4th 335, 346 (2001) (citation omitted).  In
9   addition, "[u]nder California law, a bad faith claim can be dismissed on summary
10  judgment if the defendant can show that there was a genuine dispute as to
11  coverage."  *Guebara v. Allstate Insurance Co.*, 237 F. 3d 987, 992 (2001); *Sekera v.*
12  *Allstate Ins. Co.*, 2017 WL 6550425 (C.D. Cal. Sept. 19, 2017) (granting summary
13  judgment in Allstate's favor where the "dispute over causation of the knee
14  conditions created a genuine dispute as to the value of Plaintiff's [UIM] claim");
15  *Myers v. Allstate Indem. Co.*, 109 F. Supp. 3d 1331, 1338 (C.D. Cal. June 16, 2015)
16  (granting summary judgment under the genuine dispute doctrine because Allstate's
17  dispute with the insured over the value of her UIM claim was reasonable); *see also*
18  *Ives v. Allstate Ins. Co.*, 2021 WL 667591, ___ F.Supp.3d ___ (C.D. Cal. Feb. 19,
19  2021) (applying genuine dispute doctrine to UIM claim and granting summary
20  judgment for the insurer).

21          **B.**     **Allstate Fire Is Entitled to Summary Judgment Because A**
22                     **Genuine Dispute Existed as to The Value of Plaintiff's Claim**

23          The most important factor in evaluating Plaintiff's UIM claim was her
24  contention that she had lost in excess of $28,500 in income as a result of the
25  accident -- $18,500 from her magician's assistant and contortionist job and $10,000
26  from her bakery business.  (*See* CS Nos. 54, 104).  However, as Allstate Fire has
27  demonstrated, Plaintiff provided inadequate documentation to support her claimed
28  loss of income.  Specifically, Plaintiff provided a conclusory email from Mitchell

-14-

1   that lacked any detail regarding the listed performance dates, including whether

2   Plaintiff was guaranteed these performance dates or if these were merely potential

3   employment opportunities for Plaintiff.  The only other supporting documentation

4   provided by Plaintiff was an unverified list of payments totaling $3,216.98 that

5   Plaintiff allegedly paid to her bakery assistant and a receipt for a $225 refund she

6   had given to a bakery client because she was unable to complete the job due to her

7   injuries.

8          In addition to her failure provide the necessary documentation, the undisputed

9   facts demonstrate that Plaintiff failed to fully cooperate in Allstate Fire's efforts to

10  verify the lost wages claim.  Allstate Fire asked Plaintiff to sign and return a wage

11  authorization form on December 20, 2016, on December 21, 2016, and again on

12  August 30, 2017.  (CS Nos. 20, 21, 29).  Allstate Fire specifically advised Plaintiff

13  that it needed this form to obtain "information needed to evaluate this claim."  (*Id.*)

14  Allstate Fire also asked Plaintiff, repeatedly, to provide a list of her employers so

15  that Allstate Fire would be able to obtain the missing information.  (CS Nos. 20-24,

16  29).  Plaintiff *never* returned her wage authorization form or identified her

17  employers.[5]  (CS Nos. 31, 66, 67).  Plaintiff's continual refusal to cooperate

18  prevented Allstate Fire from being able to objectively verify and determine the value

19  of her claim.[6]  Because Plaintiff's lost earnings claim was based entirely on

21  [5]   Plaintiff claims these forms were "not applicable" because she was self-employed and so did not have any employers. (*See* CS Nos. 30, 31). However, Plaintiff submitted the e-mail from Mitchell in support of her lost wages.  Whether Plaintiff was working for Mitchell as an employee or an independent contractor, Allstate Fire, at a minimum, required Plaintiff's written authorization in order to contact Mitchell regarding these purported lost job opportunities.

26  [6]   Similarly, with respect to Plaintiff's purported loss of income related to lost bakery jobs, Plaintiff produced 540 pages of bank account records in response to Allstate Fire's document requests in an effort to document her lost wage claim.  However, none of those bank account records were produced during

1  unverified and uncorroborated evidence, Allstate Fire attempted to obtain the

2  necessary information to evaluate her claim when it took her deposition.  However,

3  at her deposition, Plaintiff was unable to state how much she actually was claiming

4  as lost income.  (CS No. 118).

5         In addition, a genuine dispute existed with respect to the appropriate value of

6  Plaintiff's general damages claim.  "Translating pain and anguish into dollars can, at

7  best, be only an arbitrary allowance, and not a process of measurement." *Beagle v.*

8  *Vasold*, 65 Cal. 2d 166, 172 (1966); *Capelouto v. Kaiser Found. Hosp*., 7 Cal. 3d

9  889, 892 (1972) (holding that pain and suffering "can be translated into monetary

10  loss only with great difficulty"); *Greater Westchester Homeowners Assn. v. County*

11  *of Los Angeles*, 26 Cal. 3d 86, 103 (1979) (holding that damages for pain and

12  suffering "are inherently nonpecuniary, unliquidated and not readily subject to

13  precise calculation."). Thus, "[t]he amount to be awarded [for pain and suffering] is

14  'a matter on which there legitimately may be a wide difference of opinion." *Seffert*

15  *v. Los Angeles Transit Lines*, 56 Cal. 2d 498, 508 (1961) (citation omitted).   In this

16  case, although Allstate Fire gave Plaintiff credit for all her claimed medical

17  expenses and inadequately documented lost earnings, the value of Plaintiff's claim

18  fell well short of the $40,000 necessary to justify a payment of $25,000 policy limits

19  without a generous allocation for general damages for pain and suffering.  However,

20  a generous allocation for general damages for pain and suffering was an issue in

21  significant dispute because Plaintiff had waited thirty-seven days after the accident

22  to seek any medical attention, and there were several gaps in her treatment. (UF

23  Nos. 18, 107).  Moreover, Plaintiff failed to disclose to Allstate Fire that she was

24  suffering from depression that she attributed to the accident until she was deposed

25  on March 7, 2019.  Notwithstanding the doubtful nature of her general damages

26

27         Allstate Fire's investigation of the underlying claim even though they would
   arguably have been relevant to Allstate Fire's evaluation of her lost wage
28  claim.

claim, Allstate Fire ultimately gave Plaintiff the benefit of the doubt and allocated approximately $15,000 to general damages.  (UF No. 111).  Without that generous allocation, Plaintiff would not have been entitled to a policy limit settlement of $25,000.

The Court concludes that the undisputed evidence establishes that there was a genuine dispute existed regarding the value of Plaintiff's claim.[7]  Accordingly, because a genuine dispute existed regarding the value of Plaintiff's claim, the Court concludes that Allstate Fire is entitled to summary judgment on Plaintiff's claim for tortious breach of insurance contract.

## C.   **Allstate Is Also Entitled to Summary Judgment Because It Did Not Unreasonably Delay the Claim.**

It is well established that "[t]here can be no 'unreasonable delay' until the insurer receives adequate information to process the claim and reach an agreement with the insured."  *Globe Indemnity Co. v. Superior Court,* 6 Cal. App. 4th 725, 731 (1992); *accord Maynard,* 499 F. Supp. 2d at 1160 ("delay while the insurer seeks information and investigates the insured's claim" does not give rise to liability for bad faith).  An insurer is not obligated to pay a claim "until it [can] find out on its own, to a measure of certainty," that the benefits are owed.  *Blake v. Aetna Life Ins. Co.*, 99 Cal. App. 3d 901, 924 (1979); *accord Maynard*, 499 F. Supp. 2d at 1160 (holding that "delay while the insurer seeks information and investigates the insured's claim" does not give rise to liability for bad faith).  Indeed, it is recognized that it would be "improvident" for an insurer to pay a claim before it receives

---

[7]    Plaintiff argues that Allstate Fire's offers of $10,000 on March 5, 2019 and $15,000 on April 8, 2019, both of which Plaintiff rejected, were in bad faith because Allstate Fire's adjuster had already authorized it to pay the full policy limits to settle the claim on February 25, 2019.  However, the February 25, 2019 evaluation was a preliminary evaluation that concluded Plaintiff would only be entitled to the policy limits *if* Plaintiff was able to verify her lost wage claim at her then-upcoming deposition.

-17-

1   information verifying the claim's value.  *Blake*, 99 Cal. App. 3d at 921.

2        In this case, although Plaintiff provided only limited medical and billing

3   records and limited documents to support her lost wages claim, her lost wages claim

4   was largely unverified.[8]  Because Plaintiff's entitlement to the policy limit was not

5   established, Allstate Fire was entitled to fully investigate Plaintiff's claim and was

6   not limited to relying on Plaintiff's unsubstantiated statements regarding her lost

7   income.  The undisputed facts demonstrate that Allstate Fire did not unreasonably

8   delay investigating, evaluating, and settling the claim.  To the contrary, Allstate Fire

9   was proactive in gathering information and evaluating the claim during the course of

10  its investigation.  For example, shortly after receiving Plaintiff's written discovery

11  responses in October 2018, Allstate Fire immediately subpoenaed each of her

12  newly-identified medical providers – medical providers Plaintiff had failed to

13  previously identify despite Allstate Fire's numerous requests -- for documents and

14  received those subpoenaed records on January 29, 2019.  (CS Nos. 96 and 101).

15  Thus, Allstate Fire did not have all of the necessary information to evaluate

16  Plaintiff's claim until at least January 29, 2019, when it received all of the

17  subpoenaed medical and billing records.  (CS No.105).  Shortly after receiving those

18  _____

19  [8]   To the extent there were any delays, the Court concludes that they were
20        attributable to Plaintiff.  Plaintiff failed to return her signed medical
        authorization for fifteen months after Allstate Fire initially requested it and
21        *never* returned her wage authorization or employer information forms, and,
        thus, interfered with Allstate Fire's investigation.  (CS Nos. 30, 31, 66, 67).
22        Indeed, California Insurance Code §11580.2(o), requires an insured to
23        provide a medical and wage authorization forms within fifteen days of the
        insurer's request.  If the insured fails to comply with this requirement, the
24        UIM arbitration proceeding shall be stayed for at least thirty days after the
        insured provides the requested releases.  The stay of arbitration essentially
25        stays an insured's right to any payment under the policy.  *See Myers*, 109
26        F.Supp. 3d at 1337 (granting summary judgment for the defendant on the
        plaintiff's claim for bad faith and holding that the plaintiff's "failure to
27        provide the requested medical authorization negated her entitlement to the
        arbitration, let alone any benefits due to her following the arbitration award").
28

-18-

1 records, Allstate Fire performed its preliminary evaluation and scheduled Plaintiff's

2 deposition to obtain the missing information necessary to properly evaluate

3 Plaintiff's claim. (CS No. 106).

4       Due to numerous delays, Plaintiff's deposition was not taken until March 7,

5 2019. However, her deposition was not helpful because although given the

6 opportunity, Plaintiff was unable to verify the actual amount of her lost wages

7 claim. (CS No. 118). Ultimately, Allstate Fire promptly resolved all disputes

8 regarding Plaintiff's speculative and still uncorroborated lost wages claim in her

9 favor in order to justify the policy limit payment to Plaintiff. (CS Nos. 127, 128).

10       Therefore, the Court concludes that the undisputed facts relating to Allstate

11 Fire's investigation of Plaintiff's claim establishes that Allstate Fire did not

12 unreasonably delay the investigation or resolution of Plaintiff's claim. Accordingly,

13 the Court concludes that Allstate Fire is entitled to summary judgment on Plaintiff's

14 claim for tortious breach of insurance contract.

15 **IV.**   **CONCLUSION**

16       For all the foregoing reasons, the Court **GRANTS** Allstate Fire's Motion for

17 Summary Judgment, or, Alternatively, Partial Summary Judgment in its entirety as

18 to Plaintiff's sole claim for tortious breach of insurance contract.

19

20

21 Dated: June 10, 2021

22                                     Honorable John F. Walter

23

24

25

26

27

28

-19-